FILED & JUDGMENT ENTERED
Steven T. Salata

Apr  29  2013

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

*Laura T Beyer*
Laura T. Beyer
United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## WILKESBORO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **H. ANDRE TEAGUE,** | ) | Chapter 7 |
| | ) | Case No. 08-51088 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **BARRETT L. CRAWFORD, Trustee** | ) | |
| **for the Bankruptcy Estate of** | ) | |
| **H. Andre Teague,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 10-5071 |
| | ) | |
| **JACKIE LOUISE THOMPSON TEAGUE,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING
### JUDGMENT TO THE PLAINTIFF

**THIS MATTER** is before the court after trial on the
complaint of the Plaintiff, Barrett L. Crawford, Trustee for the
Bankruptcy Estate of H. Andre Teague.  The Plaintiff's complaint
alleges that the court should allow him to recover property the
Debtor, H. Andre Teague, transferred to the Defendant, Jackie

Louise Thompson Teague, prior to filing his Chapter 7 bankruptcy on September 24, 2008.   After considering the evidence and the argument of the parties, the court concludes pursuant to 11 U.S.C. § 548 that the Debtor fraudulently transferred property with a value of $286,734.57 to the Defendant during the two years preceding the filing of his bankruptcy.   Accordingly, the court grants judgment to the Plaintiff in the same amount.

### FINDINGS OF FACT

1.   The Debtor and the Defendant met during their mutual employment in the furniture industry and married in 1990. During the 1990s and the early 2000s, the Debtor successfully ran various furniture companies.

2.   By 2005, the Debtor's businesses were experiencing financial problems that rapidly spread to the personal finances of the Debtor and the Defendant.   Until 2005, the Debtor was the Manager and President of Dunmore Furniture, LLC ("Dunmore"), although the Debtor testified that Dunmore failed sometime in 2003 or 2004.   In January 2005, the Debtor founded Jordan Alexander, Inc. ("Jordan Alexander"), apparently in an attempt to maintain a presence in the furniture industry despite the problems at Dunmore, which the North Carolina Secretary of State administratively dissolved in April 2005.   Also during January 2005, a creditor, Piedmont Paper Company, Inc. ("Piedmont

Paper"), filed a breach of contract suit against the Debtor and Dunmore.

3.   The Debtor testified at trial that he did not pay his debts as they came due in the years preceding his bankruptcy because he could not.  He also admitted that his debts exceeded his assets from 2006 through 2008.

4.   The Debtor began transferring essentially all of his property, including his income as he earned it, to the Defendant around the beginning of 2006.  During 2006 the Defendant received $33,395.51 in checks from Jordan Alexander payable to her.  When she was deposed in this adversary proceeding, the Defendant stated that the checks were "draws" from the company that she and the Debtor used for living expenses.  At trial, the Defendant testified that she remembered the weekend before the trial started that these checks actually represented reimbursements for Jordan Alexander's start-up costs and her purchase of design frames for the company.

5.   During 2006 the Debtor also transferred $65,339.00 from a joint checking account to the Defendant's checking account.  While the source checking account bore both parties' names, the Debtor and the Defendant indicated the funds were the Debtor's.  The Defendant testified that these funds were used to pay the couple's living expenses.  She also explained that the Debtor previously paid the couple's household expenses, but,

after she received a call from a creditor about an unpaid bill sometime in 2006, the Defendant took over the bill-paying duties because the Debtor seemed overwhelmed by business problems.

6.    Of the $65,339.00 the Debtor transferred from the joint checking account to the Defendant's checking account in 2006, he transferred $54,389.00 between the beginning of the year and September 24 and $10,950.00 between September 24 and the end of the year.

7.    The couple also began liquidating their personal property and depositing the proceeds in the Defendant's account in 2006.    On September 11, 2006, they sold furniture for $3200.00.    On December 1, they sold Sea Doo personal watercrafts, which the Debtor gave to the Defendant as gifts, for $7,170.00.    The Defendant explained that the sales involved property that the couple would not need when they moved from their house in Cornelius.

8.    On December 21, 2006, the Defendant deposited a $400.00 check from Patricia Howe to the Debtor into her account. The Defendant did not remember why the Debtor received this check.

9.    The Debtor and the Defendant purchased a home in Asheville on December 28, 2006.    In order to finance the purchase, the Defendant borrowed funds from Macon Bank.    The loan documents contain several false statements by the

Defendant, including that she was employed at the time when she was actually receiving unemployment assistance; that she had been employed by Jordan Alexander for 15 years when she only briefly worked at the company (and the company had only been in existence for about two years); that her title with Jordan Alexander was Marketing Director despite her admission at trial that she did not perform any marketing; that her current income was $30,000.00/month when it was closer to $4000.00; and that there was $400,000.00 of equity in the Cornelius house.

   10.  The Debtor and the Defendant testified that they began living separately after moving out of the house in Cornelius around the end of 2006.  The Defendant said she moved to the Asheville house the couple purchased.  The Debtor gave contradictory testimony about where he moved after leaving Cornelius.  He first testified that he moved to an apartment in Hickory for a year, although he could not remember the address of the apartment.  Later he testified that, after Jordan Alexander ceased operating, he moved to Mississippi for work in "early January 2007" and lived in a "motel/hotel-type thing." The Debtor was also unable to remember his address in Mississippi.  Other evidence supports the latter explanation for the Debtor's whereabouts in early 2007, as he began to receive paychecks from his employer in Mississippi in February 2007. Both parties admitted that the Debtor stayed at the Asheville

5

house with the Defendant every other weekend when he returned "home"[1] to visit their daughter.

11.  In January 2007, the Bank of Granite filed a breach of contract lawsuit against the Debtor.

12.  During 2007, the Debtor continued to transfer property to the Defendant, including all of the income ($100,414.95) he received from his employment in Mississippi during the year. The Debtor claimed that he sent his earnings to the Defendant because he did not have a checking account in Mississippi, but he could not explain why he did not get one.  The Debtor also transferred $16,500.00 from the joint account to the Defendant's account between January and April of 2007.

13.  Similarly, the Debtor continued to transfer personal property to the Defendant during 2007.  In January they sold $1135.65 in furniture and deposited the proceeds in the Defendant's account.  The Plaintiff's evidence shows that one-half of these proceeds, or $567.83, belonged to the Debtor prior to the transfer.  In February they sold the furnishings from the Cornelius house for $22,050.00 and deposited the proceeds in the Defendant's account.  Similarly, one-half of these proceeds, or $11,025.00, belonged to the Debtor prior to the transfer.

14.  The parties sold their house in Cornelius on February 23, 2007.

---

[1] While testifying at the trial, the Debtor described the Asheville residence of the Defendant as "home" before correcting himself.

15.  The Defendant executed a limited power of attorney to allow the Debtor to sign her name at the closing of the sale of the Cornelius house.  She trusted the Debtor with her power of attorney despite testifying that she stopped trusting the Debtor when she received the collection call in 2006.

16.  At the beginning of March 2007, the Defendant deposited the proceeds from the sale of the Cornelius property into her account.  After settling the various liens on the Cornelius property (including a tax lien and a mortgage that the Defendant claimed to be unaware of), the Debtor and the Defendant received the remaining proceeds of $42,533.44, and the Defendant deposited the proceeds in her account.  One-half of these proceeds, or $21,266.72, belonged to the Debtor prior to the transfer.  The Defendant subsequently used the majority of these funds to pay down the debt on the Asheville house.

17.  On March 12, 2007, two events important to this case occurred at the same location.  First, the Buncombe County Superior Court entered a $45,000.00 judgment against the Debtor in the Piedmont Paper lawsuit.  Second, a deed transferring the Asheville house from the joint ownership of the Debtor and the Defendant to the sole ownership of the Defendant was recorded at the Buncombe County Register of Deeds.  The Buncombe County Superior Court and the Buncombe County Register of Deeds are located in the same building.  The Defendant claimed that the

confluence of these events was simply a coincidence.  She also claimed that the Debtor was never supposed to be an owner of the Asheville property; argued that the March 12 deed, for which the Debtor received no consideration, was simply correcting an attorney's mistake; and pointed out that the Debtor was not on the mortgage for the property.  The Plaintiff produced evidence showing that, when they purchased the Asheville house, both the Defendant and the Debtor initialed the deed indicating they would own the home jointly.  In addition, the Plaintiff produced the mortgage application showing that the parties planned to share ownership of the property.  The Defendant claimed these documents were also mistakes and blamed her lack of business and legal sophistication for the alleged errors.

18.  Near the end of March 2007, the Defendant deposited two checks totaling $939.44 from Countrywide Home Loans, Inc. in her account.  She testified that these funds represented refunds related to the mortgage on the Cornelius property.  One-half of these funds, or $469.72, belonged to the Debtor.

19.  In April 2007, the Defendant deposited $18,900.00 from the sale of a country club membership related to the Cornelius property into her account.  Although this check was only made out to the Debtor, the Defendant testified that the membership was jointly owned.  One-half of these funds, or $9450.00, belonged to the Debtor.

20. On May 9, 2007, American Decorative Fabrics, LLC ("American") filed a breach of contract suit against Jordan Alexander, the Debtor, the Defendant, and the minor daughter of the Debtor and the Defendant.

21. In June 2007, the Debtor began signing his social security checks over to the Defendant and transferred $11,454.60 to her over the remainder of the year.

22. The Debtor also transferred his 1997 Chevrolet Suburban to the Defendant in June. The Defendant executed a Highway Use Tax Exemption Certification with the North Carolina Division of Motor Vehicles under the penalty of law related to the Suburban transfer. The Defendant indicated on this form that the transfer was a "Gift from husband to wife," and, notably, she did not check the box representing "disposition of marital property due to separation or divorce."

23. In July 2007, the Debtor transferred his 2000 Mercedes to the Defendant. The Defendant executed another Highway Use Tax Exemption Certification form that indicated the Mercedes transfer was also a gift and not a division of property pursuant to a separation. After transferring the Mercedes, the Debtor did not own a vehicle, although he has consistently used the Suburban for the last five years as his only mode of transportation, including driving it back and forth from Mississippi. At trial, the Debtor was asked why the title to

the Suburban was transferred if he was going to continue using it. The Debtor said the query was a "good question," but he did not have an answer for it.

24. At the beginning of September 2007, the Defendant deposited a $472.75 check written to the Debtor from Central Mutual Insurance Company into her account. At trial, the Defendant stated she could not remember why the insurance company sent these funds to the Debtor. At her deposition, the Defendant said these funds could have been a homeowner's insurance refund.

25. On September 26, 2007, the Debtor and the Defendant executed a separation agreement. The parties were not individually represented by counsel when they entered into this agreement. The separation agreement gives almost all of the Debtor's property to the Defendant. The agreement states that the Debtor transfers his interest in the cars and will transfer his interest in the Asheville house to the Defendant, despite the fact that those properties had already been transferred. The agreement provides that the Debtor will deliver his entire paycheck, all of his social security income, and half of the commissions he earns to the Defendant, apparently in perpetuity, as there is no time limitation on the payments. In addition, the agreement required the Debtor to name the Defendant as beneficiary of his life insurance policies. Despite giving

almost all of the Debtor's property to the Defendant, the agreement allows the Defendant to keep all of her investments and other property.

26. The Defendant could not explain how the parties negotiated the separation agreement. She claimed the Debtor encouraged her to "tell [him] what [she] want[ed]" and did not "argue at all" about the distribution of property. The Debtor described the separation agreement as providing "basically that [the Defendant] got everything."

27. While the separation agreement states that the couple separated in September 2007, the evidence presented at trial did not paint a clear picture of when the parties separated (and raises the question of whether they ever did). At trial, the Defendant said the marital relationship ended early this millennium but the couple did not divorce at that time because she wanted to provide a stable home for their young daughter. The Defendant also gave contradictory testimony that she and the Debtor separated in both 2006 and 2007. The Debtor said he did not know when they separated. When he tried to nail down the time frame, the Debtor first stated that he thought they separated before he filed his bankruptcy in September 2008, and then claimed they separated before executing the separation agreement in September 2007. Both parties agreed that the Debtor stayed at the Defendant's residence every other weekend to visit

their daughter during 2007 and 2008 when he lived in Mississippi. At an examination pursuant to Fed. R. Bankr. P. 2004 in May 2010, the Defendant said she and the Debtor were attempting to reconcile. When the Plaintiff examined the Debtor's adult daughter from a previous marriage, Amanda Teague ("Amanda"), at around the same time, she expressed surprise that the Debtor and the Defendant claimed to have separated years earlier.

28. After executing the separation agreement, the Debtor continued transferring all of his income to the Defendant. The Defendant typically sent some money back to the Debtor to pay his living expenses. The Debtor claimed at trial that the Defendant agreed that she would provide funds to pay his living expenses. This agreement regarding the Debtor's living expenses is not reflected in the separation agreement, which by its terms purports to contain all of the obligations of the parties.

29. On June 11, 2008, the Defendant deposited two checks from the Hartford totaling $3313.97 into her account. The Defendant testified that these funds represented a refund of homeowner's dues. One-half of these funds, or $1656.99, were the Debtor's property prior to the transfer.

30. The Defendant deposited a $9474.90 check from the John Hancock Life Insurance Company ("John Hancock") payable to the Garlikov/Teague October 2008 Partnership into her account on

October 5, 2007. Despite the separation agreement provision indicating that the Debtor would retain his life insurance policies and name the Defendant as beneficiary, the Defendant testified that these funds were the proceeds of the sale of one of the policies.

31. The Debtor and the Defendant filed their 2007 tax returns jointly, despite a provision in the separation agreement that states they would not.

32. In 2008, the Debtor continued to transfer property to the Defendant. From the beginning of the year until the Debtor filed his Chapter 7 bankruptcy on September 24, 2008, the Debtor transferred $53,456.49 earned through his employment in Mississippi to the Defendant. During the same time period, the Debtor transferred $5868.11 in social security income to the Defendant.

33. In January 2008, the Defendant deposited two checks from John Hancock in the total amount of $33,306.51. The Defendant testified that these funds came from the sale of the Debtor's other life insurance policies.

34. The Debtor left Mississippi and moved to Asheville around July 2008. At her deposition for this adversary proceeding, the Defendant said the Debtor moved into the Asheville house at this time. At trial, the Defendant claimed that he rented an apartment in Asheville instead.

35.   On September 24, 2008, the Debtor filed his Chapter 7 bankruptcy petition.

36.   In his bankruptcy petition, the Debtor listed his street address as "425 East I Street, Newton, NC" and his mailing address as "P.O. Box 271, Arden, NC."   At trial the Debtor admitted that the Newton address was the residence of his daughter, Amanda; that he never lived at Amanda's house; and that he was not sure if he had even spent a night at Amanda's house prior to filing his petition.   Amanda testified at the trial and confirmed that the Debtor never lived with her at the Newton address and had only visited her residence once prior to filing bankruptcy.   The Debtor testified that he listed Amanda's address as his own so he could receive mail, which is illogical because he listed her address as his residence and a post office box as his mailing address.   Consequently, any mail related to his bankruptcy would have been sent to the post office box, not Amanda's address.

37.   The Debtor's original Statement of Financial Affairs, filed with his petition, states that he lived at the Asheville house from October 2007 to March 2008.   At trial, the Debtor explained that this address was also just a mailing address, despite the fact that he listed it, under penalty of perjury, as "premises which [he] occupied during that period."

38.   In addition to the problems with the addresses the Debtor listed as his residences, his original bankruptcy schedules omitted a few parcels of real property and about a dozen businesses that the Debtor owned.

39.   The Debtor and the Defendant filed their 2008 tax return jointly in violation of the separation agreement and despite the Defendant's contention that she would have saved $8,000.00 by filing separately.

40.   The Plaintiff filed this adversary proceeding on September 21, 2010.

41.   The Defendant filed for divorce from the Debtor on October 15, 2010.   Her original answer to the Plaintiff's complaint bears the date of the following day, October 16, 2010, and was filed on October 20, 2010.

42.   The Debtor and the Defendant became divorced on January 11, 2011.

**CONCLUSIONS OF LAW**

43.   In certain situations, section 548 allows a bankruptcy trustee to "avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition . . . ." 11 U.S.C. § 548(a)(1).   One situation to which section 548 applies is actual fraud, where a debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity

to which the debtor was or became . . . indebted."
§ 548(a)(1)(A). A trustee must show a debtor's fraudulent
intent[2] by clear and convincing evidence. Whitaker v. Mortgage
Miracles, Inc. (In re Summit Place, LLC), 298 B.R. 62, 70
(Bankr. W.D.N.C. 2002). Section 548 also applies to
constructive fraud, which occurs when a debtor "received less
than a reasonably equivalent value in exchange for such transfer
or obligation" and "was insolvent on the date that such transfer
was made or such obligation was incurred, or became insolvent as
a result of such transfer or obligation." § 548(a)(1)(B).

44. Since debtors will rarely admit their fraudulent
intent, showing actual fraud presents an evidentiary problem for
bankruptcy trustees and other litigants. Courts solved this
evidentiary problem by allowing proof of actual fraud through
circumstantial evidence in the form of "badges of fraud."
United States v. Schaudt (In re Schaudt), 2012 WL 909299, at *6
(Bankr. N.D. Ill. Mar. 16, 2012); Whitaker, 298 B.R. at 70. The
use of badges of fraud to determine actual fraud dates back to
the enforcement of the Statute of Elizabeth in England in the
17th Century. See Twyne's Case, 3 Coke 80b, 76 Eng. Rep. 809
(Star Chamber 1601); see also Tabor v. Kelly (In re Davis), 2011
WL 5429095, at *11 (Bankr. W.D. Tenn. Oct. 5, 2011) ("Section

---

[2] The intent at issue is that of the debtor/transferor, not the non-
debtor/transferee. Dobin v. Hill (In re Hill), 342 B.R. 183, 198 (Bankr.
D.N.J. 2006). The intent of the non-debtor/transferee is only relevant in
the context of a good faith defense pursuant to § 548(c). Id.

548(a)(1) merely codifies the action for fraudulent conveyance that has been part of the common law since at least Twyne's Case.").

45. Some of the more common traditional badges of fraud are: (1) litigation, or the threat of litigation, against the debtor at the time of the transfer; (2) a transfer of all or most of the debtor's property; (3) the debtor's insolvency at the time of the transfer; (4) a special relationship between the debtor and the transferee; and (5) retention of the allegedly transferred property by the debtor. Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254 (1st Cir. 1991).

46. North Carolina's version of the Uniform Fraudulent Transfer Act ("UFTA") contains a non-exhaustive list of thirteen badges of fraud. N.C. GEN. STAT. § 39-23.4(b). They are (1) a transfer to an insider, (2) the debtor's retention of possession or control of property after the transfer, (3) the debtor's concealment of a transfer, (4) a transfer after the debtor is threatened with a lawsuit, (5) transfer of substantially all of the debtor's assets, (6) absconding by the debtor, (7) concealing of assets by the debtor, (8) the debtor receiving less than equivalent value in a transfer, (9) the debtor's insolvency before or immediately after the transfer, (10) transfer before or immediately after the debtor incurs a substantial debt, (11) transfer by the debtor of essential

17

business assets to a lienor who then transfers the assets to an insider, (12) the debtor receiving less than equivalent value when the debtor reasonably should have known he would incur debts beyond his ability to pay, and (13) transfers not in the course of legitimate estate or tax planning. Id.; see also Hill, 342 B.R. at 198 ("Since the UFTA and § 548 both examine actual intent to determine the propriety of a transfer, the factors listed under . . . UFTA are equally applicable to § 548."); Fogel v. Chevrie (In re Chevrie), Nos. 99-B-6542, ADV.-00-A-38, 2001 WL 120132, at *8 (Bankr. N.D. Ill. Feb. 13, 2001) (concluding that UFTA provisions "essentially parallel" § 548(a)(1)).

47. "The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." Whitaker, 298 B.R. at 70. The presence of several badges of fraud leads to a presumption of fraudulent intent. Kelly v. Armstrong, 206 F.3d 794, 798 (8th Cir. 2000). The debtor can overcome the presumption by showing a "legitimate intervening purpose" for the transfers. Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 806 (9th Cir. 1994).

48.  The court concludes that all five of the traditional badges of fraud identified above are present in the transfers between the Debtor and the Defendant.  Piedmont Paper brought its lawsuit against the Debtor prior to the transactions at issue, and the Debtor was also dealing with other litigation, including the Bank of Granite lawsuit.  The Debtor transferred substantially all of his property to the Defendant, including property he would acquire in the future (i.e., future income from employment and social security).  The Debtor admitted he was insolvent during the time period in question.  The Debtor and the Defendant were married at the time of all of the transfers.  Finally, the Debtor continued to use the Suburban for years after purportedly transferring it to the Defendant.

49.  In addition, most of the badges listed in North Carolina's Uniform Fraudulent Transfers Act are present.  The Debtor transferred property to an insider, see 11 U.S.C. § 101(31); N.C. GEN. STAT. § 39-23.1(7), retained possession of transferred property, transferred property while defending lawsuits, transferred substantially all of his assets, received less than equivalent value for his transferred property, was insolvent at the time of the transfers by his own admission, transferred the property after incurring significant debt, received less than equivalent value for the transfers and knew or should have known he would incur debts beyond his ability to

pay, and did not transfer the property pursuant to legitimate tax or estate planning.

50. The court concludes that the presence of all of the traditional badges of fraud and most of the UFTA badges leads to a presumption that the Debtor acted with actual fraudulent intent. In order to overcome the presumption, the Defendant must show a legitimate intervening purpose. To that end, the Defendant points to the separation and, more specifically, the separation agreement.

51. Divisions of property pursuant to a divorce decree are considered transfers subject to § 548, even when the transfer is a decision not to exercise the right to equitable distribution. Corzin v. Fordu (In re Fordu), 201 F.3d 693, 702 (6th Cir. 1999). Transfers pursuant to a bona fide divorce decree or separation agreement could provide the legitimate purpose necessary to overcome a presumption of fraud; however, "the fact that a transfer occurs in the context of the divorce proceedings does not immunize such transfer from a § 548 attack by a trustee in bankruptcy for one of the marital partners." Harman v. Sorlucco (In re Sorlucco), 68 B.R. 748, 753 (Bankr. D.N.H. 1986). If a divorce or separation is a sham that does not change the relationship of the parties, "it is easy for the court to find that the division of property was a fraudulent transfer." Dobin, 342 B.R. at 196; see also Rogers v. Boba (In

re Boba), 280 B.R. 430, 434—36 (Bankr. N.D. Ill. 2002) (granting summary judgment to a trustee on the issue of a debtor's fraudulent intent where the debtor transferred most of his property to his spouse, the spouse was not represented in the divorce, and the debtor continued to reside in a house and use a truck after each was purportedly transferred). Even if the divorce or separation is valid, the division of property may not be, as a debtor may prefer to transfer assets to an ex-spouse instead of satisfying the claims of creditors, especially if the ultimate beneficiary of the transfer could be the progeny of the marriage. Dobin, 342 B.R. at 196, 202. In this situation a court can avoid an inequitable division of property. Id. at 204.

52. Like fraud, direct evidence of a sham divorce or separation is rare. See Schauldt, 2012 WL 909299, at *14. Courts have developed "badges" for this situation as well, including "the quickly agreed to split of property, the completion of the divorce proceeding on a 'fast track,' the fact that one of the spouses was not represented by counsel in the divorce proceeding, the existence of a short interval between the entry of the divorce decree and the bankruptcy filing, the fact that spouses continue to live together after the divorce in the very house that was transferred to one of the spouses, the fact that the transferor spouse continues to pay the mortgage,

taxes, and other costs on the transferred house, the inequitable distribution of debts and assets in the divorce, and the fact that the couple holds themselves out in the public as still being married." Id. at *13.

53. Most of these badges of a sham divorce are present in the separation and eventual divorce of the Debtor and the Defendant, and even the factors that are not present raise questions about the alleged conclusion of their relationship. The parties quickly agreed to a division of property and could not explain how those decisions were made. Only one attorney was involved in preparing and advising the parties about the separation agreement. The Debtor continued to live in the Defendant's Asheville house on occasion after he transferred his interest in it to the Defendant. The couple's assets could not have been distributed any more inequitably, as the Defendant basically took all of their property. While the court does not have evidence that the couple continued to hold themselves out as married after their separation, there is evidence that the Debtor did not tell his daughter about the separation for years, so, at a minimum, the couple did not hold themselves out as separated.

54. While the parties' divorce was not "fast-tracked" and there was not a short interval between the divorce decree and the bankruptcy filing, the absence of these factors does not

support the parties' argument that their separation and divorce was not a sham.  The divorce was extremely "slow-tracked," as neither party sought a divorce for years, until after the Plaintiff filed his complaint in this adversary proceeding.  The court questions whether the parties would have ever actually divorced if the Plaintiff had not filed his complaint.

55.  The court concludes that the division of property pursuant to the separation agreement was a sham and is not a legitimate intervening purpose that can overcome the presumption of the Debtor's fraudulent intent based on the badges of fraud. In short, the Debtor apparently sought to shield his assets from his creditors by transferring them to his spouse, and the parties' separation and eventual divorce was simply a tactic used to attempt to avoid any appearance of impropriety.

56.  If a transfer is avoided under section 548, section 550 of the Bankruptcy Code allows a trustee to recover the property transferred or the value of the property for the benefit of the Debtor's estate.  11 U.S.C. § 550.

**REMEDY**

57.  The Plaintiff can avoid any transfers from the Debtor to the Defendant in the two years preceding the filing of the Debtor's bankruptcy petition.  11 U.S.C. § 548.  The Plaintiff asserts that the Defendant is liable for receiving property with a total value of $500,064.90 from the Debtor.  The Plaintiff,

however, significantly overestimates the Defendant's liability
by including several transfers not subject to avoidance under
the theories advocated by the Plaintiff in this case.

58. For example, the Debtor filed his petition on
September 24, 2008, <u>see</u> Voluntary Petition, Case No. 08-51088,
but the Plaintiff includes $90,984.51 in transfers that occurred
prior to two years before the Debtor's bankruptcy filing. The
Plaintiff did not share any argument that would allow the court
to ignore the plain language of section 548. § 548 ("The
Trustee may avoid any transfer . . . that was made or incurred
on or within 2 years before the date of the filing of the
petition . . . .").[3]

59. $33,395.51 of the $90,984.51 transferred more than two
years prior to the Debtor's bankruptcy filing is also non-
avoidable for another reason: the $33,395.51 represents
transfers of money from Jordan Alexander to the Defendant, not
transfers from the Debtor to the Defendant. The Plaintiff did
not produce any evidence that Jordan Alexander is anything other
than what it appears to be, a corporate entity separate from the

---

[3] The Plaintiff also brought causes of action under North Carolina's version
of UFTA and 11 U.S.C. § 547. At trial, the Plaintiff focused his argument on
section 548, and the other causes of action do not appear to reach back
further than section 548. North Carolina's UFTA has a 4-year statute of
limitations, <u>see</u> N.C. GEN. STAT. § 39-23.9, but the Plaintiff brought this
adversary proceeding two years after the Debtor filed bankruptcy, so the 4-
year statute of limitations appears to reach back to approximately two years
prior to the filing of this case, or the same time frame as section 548.
Section 547 only reaches back one year prior to the filing of the underlying
bankruptcy case. If the Plaintiff had a theory for extending the reach back
period beyond September 24, 2006, he did not share that theory with the
court.

Debtor.    Section 548 allows trustees to avoid transfers from debtors, not transfers from a separate corporate entity that a debtor owns.

60.  The Plaintiff also seeks $67,500.00 representing half of the equity in the Asheville home that the parties jointly owned prior to the Debtor's transfer of his interest to the Defendant on March 12, 2007; however, the evidence shows that the equity in that property resulted from the proceeds of the sale of the couple's home in Cornelius, the income and other funds the Debtor transferred to the Defendant, and the Defendant's funds from inheritances and the sale of stock.   The Defendant will be required to reimburse the Plaintiff for the income and other funds transferred by the Debtor and the Debtor's share of the funds that she received from the Cornelius house.   If the court required the Defendant to also return the equity from the Asheville house, the Plaintiff would recover twice for the same transfers.   The Plaintiff is not entitled to the equity that resulted from the Defendant's inheritances and stock.[4]

61.  The Plaintiff did not present any competent evidence of the value of the two vehicles transferred from the Debtor to the Defendant but seeks to recover $22,050.00 for their

---

[4] While the multitude of inconsistencies and contradictions in the testimony of the Debtor and the Defendant cause the court to view their statements with a high degree of skepticism, the Defendant produced documentary evidence of her inheritances and stock sales that the Plaintiff did not controvert.

transfer.   The transferred vehicles are a 1997 Chevrolet Suburban and a 2000 Mercedes S500, and the transfers occurred in the summer of 2007.   Instead of asserting values for those vehicles, the Plaintiff entered into evidence the 2012 values of a 2002 Suburban and a 2005 Mercedes in an attempt to show values for a 10-year-old Suburban and a 7-year-old Mercedes.   The court cannot rely on the value of a 2002 Suburban and a 2005 Mercedes in 2012 to establish the value of a 1997 Suburban and a 2000 Mercedes in 2007 because the vehicles are too dissimilar.[5] Since the Plaintiff did not present any evidence of the value of the cars at issue, the Plaintiff cannot recover for their transfer.

62.   The Plaintiff seeks to avoid the transfer of the $7170.00 in proceeds from the sale of the couple's Sea Doos, but a chart introduced into evidence by the Plaintiff states that "he [the Debtor] gifted them to her [the Defendant] in 1998." If the Sea Doos were a bona fide gift from the Debtor to the Defendant, which the Plaintiff apparently concedes, they were the Defendant's separate property, as are the proceeds from their sale.

63.   Finally, the Plaintiff seeks to recover $5824.37, apparently representing part of the Debtor's inheritance from his mother's estate, that the Debtor transferred post-petition;

---

[5] As a result of the time value of money, the value of a newer car at a later date will generally be more than the value of an older car at an earlier date, even if one assumes that the two cars are otherwise identical.

however, none of the theories of recovery asserted by the Plaintiff apply to post-petition transfers. While the Plaintiff may be entitled to recover these funds, he did not assert a cause of action that would enable him to do so through this adversary proceeding.

64. The Plaintiff may recover $286,734.57 transferred from the Debtor to the Defendant pursuant to 11 U.S.C. §§ 548 & 550.

### CONCLUSION

Bankruptcy provides a refuge for the "honest but unfortunate" debtor. Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934). While the Debtor may have been unfortunate, he chose to respond to his financial difficulties by transferring the majority of his assets to his wife in an attempt to shield them from his creditors, and the parties used a sham separation agreement in an attempt to add an air of legitimacy to the transfers. As a result, his wife, the Defendant, must return the value of the transferred property, $286,734.57, to the Debtor's estate for the benefit of his creditors.

Based on the above findings of fact and conclusions of law, the court will enter judgment against the Defendant by separate order.

**SO ORDERED.**

This Order has been signed
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

                                        United States Bankruptcy Court